## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JEFFERY J. PETREY,                      )
                                        )
            Plaintiff,                  )
                                        )           No.  06 C 2913
vs.                                     )
                                        )           Magistrate Judge Schenkier
MICHAEL J. ASTRUE, Commissioner         )
of the Social Security Administration,  )
                                        )
            Defendant.                  )

## MEMORANDUM OPINION AND ORDER

On November 2, 2004, Jeffery J. Petrey filed an application for Disability Insurance Benefits

("DIB"), alleging that he had been disabled from performing any gainful activity since June 18,

1998, due to severe low back pain problems, leg pain and anxiety attacks (R. 19). Mr. Petrey's claim

was initially denied by the Social Security Administration ("SSA") by a notice dated January 24,

2005, and on reconsideration by notice dated May 12, 2005 (R. 19). After a request for hearing was

timely filed on May 18, 2005, Mr. Petrey appeared with a non-attorney representative before the

Administrative Law Judge ("ALJ") on December 8, 2005 (R. 19).

At the beginning of the hearing, the ALJ briefly questioned Mr. Petrey regarding preliminary

matters such as his age, past occupation, educational background, and cause of the original injury.

But, subsequently, the ALJ did not go through the normal procedure of having a claimant testify in

a question and answer format (R. 271-73). Instead, the ALJ had Mr. Petrey's non-attorney

representative, James Miller, summarize the facts, and then had Mr. Petrey adopt the summary as

his own sworn testimony upon Mr. Petrey's agreement (R. 273, 275). While Mr. Petrey was given

an opportunity to change or add to Mr. Miller's summary, he did not avail himself of that opportunity

(R. 275). Dr. Walter Miller, a medical expert ("ME"), and Edward Pagella, a vocational expert ("VE"), were present and testified at the hearing. In a written decision on December 22, 2005, the ALJ denied Mr. Petrey's claim for DIB (R. 19-28). The SSA Appeals Council, considering the letter from Petrey's non-attorney representative, dated December 28, 2005, denied review of the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner, subject to judicial review of this court (R. 4-5).

Mr. Petrey now brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision denying his application for DIB (R. 6). The parties have filed cross motions for summary judgment; plaintiff seeks reversal or remand of the ALJ's decision (doc. # 23), and the Commissioner ("Commissioner") of the Social Security Administration ("SSA") seeks a judgment affirming the ALJ's decision (doc. # 26). Pursuant to 28 U.S.C. § 636(c) and by the consent of the parties, the case has been assigned to this Court for all proceedings, including the entry of final judgment (doc. # 18). For the reasons set forth below, the Court grants Mr. Petrey's motion for summary judgment and denies the Commissioner's motion for summary judgment. We remand the case for further proceedings consistent with this opinion.

I.

The following facts are taken from the administrative record, the administrative hearing transcript, and the ALJ's written decision. The Court will discuss Mr. Petrey's personal and medical history first, and then will set forth a summary of the ALJ's written decision.

A.

Mr. Petrey was born on November 17, 1963 and was 42 years old at the time of the administrative hearing (R. 20). He is a high school graduate with one year of college education (R.

2

20, 273). Mr. Petrey is single: he is separated from his girlfriend, who is the mother of his 8-month-old son (R. 79, 136). Prior to his alleged disability, Mr. Petrey worked as a conveyor technician (R. 273), which was described by the VE at the hearing as semi-skilled heavy work (R. 20).

## B.

On May 24, 1994, while at work lifting heavy side frames, Mr. Petrey injured his back (R. 271-72). He reported the injury to his supervisor. After seeing a chiropractor for several months, Mr. Petrey returned to his work (R. 272). But, about one half year later, Mr. Petrey's back pain became so severe that he had to hold on to walls and railings to walk around (R. 272). This led to an extended period of treatment, consultation and review by a number of doctors, which we summarize below.

### 1. Dr. Charles Slack, M.D.

In September 1995, Mr. Petrey's employer's worker's compensation insurer sent Mr. Petrey to Dr. Charles Slack, an orthopedic surgeon at Midwest Orthopedics. Dr. Slack continued seeing Mr. Petrey from September 1995 through December 2005 (*See* R. 120-25, 130-31, 156-87, 207-13, 217-22). Mr. Petrey visited Dr. Slack on a regular basis – almost once every month – from 1995 to 1999 (*See* R. 156-87, 192-99, 207-13, 217-222). In late 1999, upon Dr. Slack's consistent recommendation and the insurer's eventual authorization, Mr. Petrey received an evaluation by the pain management program at the Rehabilitation Institute of Chicago ("RIC") (R. 159, 160-63, 165-79). From 2000 through 2005, Mr. Petrey reduced the frequency of the visit to Dr. Slack's clinic to roughly one time every year (R. 120-25, 130-31).

In a letter dated November 19, 1999 to the pain management program at Loyola University Medical Center, Dr. Slack summarized Mr. Petrey's medical history (R. 156). Dr. Slack reported that

3

Mr. Petrey had his first lumbar MRI in October 1995, which revealed significant degenerative disc changes at L3-4 and L5-S1. In addition, at the L5-S1 level there was a diffuse disc bulge and at the L3-L4 level there was a central to right disc protrusion of moderate size (R. 156). Subsequently, Mr. Petrey underwent epidural injections followed by physical therapy and medication (R. 156). Due to his continuous pain, in April 1997, Mr. Petrey underwent a second MRI revealing a herniated disc at the L3-4 level with an extruded fragment (R. 156). After a myelogram, Mr. Petrey underwent a right L3-4 hemi-laminectomy[1] with excision of a herniated disc on May 2, 1997 (R. 156).

After he recovered from the surgery, Mr. Petrey went back to work on modified duty (R. 156). Mr. Petrey reported that his low back pain continued (R. 156). A third MRI scan showed recurrent middle right paramedian disc protrusion at the L3-4 causing mild anterior right-sided impression on the thecal sac, the site of his surgery (R. 211). Dr. Slack opined that it was a recurrent disc herniation and decided to take a conservative approach by using epidural steroid injections rather than surgical intervention (R. 211). Thereby, Mr. Petrey underwent three epidural injections on February 11, February 25 and March 11, 1998, respectively (R. 211). Dr. Slack allowed Mr. Petrey to return to his prior modified duty as of March 30, 1998 for four days a week, subject to a reevaluation four weeks later (R. 211).

On March 26, 1998, Dr. Slack requested that Mr. Petrey work with physical therapy to decrease his pain, and recommended that he remain temporarily, totally disabled until he was seen after he had physical therapy for about two weeks (R 209). However, after two weeks of physical therapy, Mr. Petrey experienced increased pain radiating to his legs with tingling into his feet (R.

---

[1]Laminectomy refers to the division of the lamina, a thin flat plate of a composite structure, and vertebra, any of the thirty-three bones of the spinal column. *Dorland's* 963 (29th ed. 2000).

4

207). On April 27, 1998, Dr. Slack opined that Mr. Petrey should be limited to sedentary work requiring no lifting work or repetitive bending or twisting but allowing frequent change in position (R.207). Dr. Slack further opined that Mr. Petrey's work hours should be limited to four hours a day, subject to an increase to six hours a day a couple of weeks later (R. 207).

Mr. Petrey returned to work as of May 7, 1998 on a limited basis (R. 194). After a few days at work, he was off work for several days due to increased pain, and then tried to work four days a week at a sedentary position (R. 187). However, since Mr. Petrey's pain caused difficulty tolerating even modified work duty, on June 29, 1998, Dr. Slack recommended that Mr. Petrey work on a temporary disability basis until the results of the EMG were available (R. 184). On August 3, 1998, Dr. Slack suggested that since the intensity of pain interfered with Mr. Petrey's daily function, Mr. Petrey should see a pain management program doctor and remain temporarily disabled, even though the result of the EMG on July 27, 1998 was negative, indicating no radiculapathy.[2]

Dr. Slack completed two reports concerning Mr. Petrey's residual functional capabilities ("RFC").[3] On August 23, 2004, Dr. Slack opined in the work status report that Mr. Petrey could not lift more than 10 pounds and had more than 50 percent reduced capacity for walking, bending, standing, stooping, sitting, turning, and climbing (R. 220, 222). In the other RFC evaluation on February 3, 2005, Dr. Slack reported that Mr. Petrey was not a malingerer and his impairments were reasonably consistent with the symptoms and functional limitations (R. 108). Dr. Slack assessed that Petrey's pain would constantly interfere with his ability to maintain attention and concentration (R.

---

[2]Radiculopathy refers to disease of the nerve roots. *Dorland's* 1511.

[3]"Residual functional capacity is a measure of 'how much an adult can do despite his impairment.'" *Zurawski v. Halter*, 245 F.3d 881, __ n.5 (7th Cir. 2001).

5

108); thus Petrey would need to change positions after only 15 minutes of sitting or standing (R. 108) and could sit or stand/walk for less than two hours total out of an eight-hour work day (R. 109). Dr. Slack opined that Petrey would be incapable of any lifting of over 10 pounds (R. 109) and never be able to twist, stoop, crouch/squat, or climb ladders (R. 110). Dr Slack further opined that Mr. Petrey would likely have to be absent more than four days a month due to his ongoing, constant low back pain (R. 110).

### 2. Dr. Michelle Muellner, M.D.

On January 5, 2000, Mr. Petrey was evaluated at the pain management program at the RIC by Dr. Michelle Muellner (R. 134-38). In the initial evaluation, Dr. Muellner opined that Petrey had chronic low back pain, status post surgery, consistent with myofascial[4] pain syndrome and had pelvic girdle dysfunction (R. 138). Dr. Muellner recommended that Mr. Petrey obtain medical/cardiac clearance before the examination proceeded. In addition, Dr. Muellner reported that Mr. Petrey had the goal of carrying on with his life and possibly retraining for another job, although Mr. Petrey had concerns about how he would support himself and his child if the Worker's Compensation payments stopped (R. 136).

### 3. Patricia Cole, Ph.D.

After an initial evaluation of Mr. Petrey's psychological condition on January 5, 2000, Dr. Cole, a staff psychologist at the RIC, reported that Mr. Petrey wanted to control his pain and to get back to work as soon as possible, even though Mr. Petrey expressed anger toward his employer, which Dr. Cole stated might act as an obstacle to his treatment (R. 140-41). Dr. Cole opined that Mr.

---

[4]Myofascial: pertaining to or involving the fascia surrounding and associated with muscle tissue. *Dorland's* 1170.

Petrey might also be caught in a vicious cycle where depression and lack of energy and motivation

resulted in a decrease in daily activities, further contributing to increased pain and depression (R.

142). Dr. Cole diagnosed Mr. Petrey as having pain disorder with psychological factors, major

depressive disorder, opioid dependence and chronic pain syndrome (R. 143). Dr. Cole assessed Mr.

Petrey's depression as severe and his pain control problems as moderate to severe (R. 144). Dr. Cole

assigned Mr. Petrey a score of 50 on the Social Occupational Functioning Assessment ("SOFA")

scale (R. 143).

### 4. Dr. Kim Young-Ja.

On December 22, 2004, Dr. Young-Ja, an agency examiner, prepared a physical residual

functional capacity assessment based on a review of medical records (R. 223-230). Dr. Young-Ja

opined that Mr. Petrey could occasionally lift or carry 10 pounds, and less than 10 pounds frequently

(R. 224). In addition, Dr. Young-Ja stated that Mr. Petrey could stand or walk for a total of at least

two hours in an eight-hour work day, sit for a total of six hours in an eight-hour day, and push and

pull without limitation (R. 224). Dr. Young-Ja found no manipulative, visual, communicative or

environmental limitations (R. 224).

Dr. Young-Ja acknowledged that his assessment of Mr. Petrey's physical RFC was not as

restrictive as that of Dr. Slack. Dr. Young-Ja opined that Dr. Slack's statement that Mr. Petrey "is

unable to return to gainful employment because of ongoing pain response not supported by the

evidence in file" (R. 229). Dr. Young-Ja's report offered no discussion to explain that opinion.

### 5. Dr. Hermsmeyer Carl.

On May 3, 2005, Dr. Carl, an agency examiner, completed a psychiatric review technique

form that assessed Mr. Petrey's medical records for the period June 18, 1998 through December 31,

7

2003 (R. 233-46). Dr. Carl checked only one box on the form, stating that there was "insufficient evidence" to offer an opinion (R. 233). Dr. Carl did not explain that conclusion, or address why the diagnosis by Dr. Cole of RIC in January 2000 of major depressive disorder causing a severe depression problem and moderate to severe pain control problems (R. 143-144) was "insufficient evidence."

### 6. Dr. Walter Miller.

At the administrative hearing, Dr. Walter Miller was called by the ALJ to testify as a medical expert ("ME"). He testified that even through there was recurrent disc protrusion, there was no evidence indicating herniated disc on the nerve root (R. 276). Dr. Miller stated that there were no symptoms of radiculopathy, which requires a compromise of the nerve root itself by some pathological process (R. 276).

Dr. Miller also testified that Dr. Muellner's diagnosis of myofascial pain syndrome did not have any anatomical meaning because the syndrome can range from very mild to severe. In addition, Dr. Miller stated that Dr. Slack's statement that Mr. Petrey had a lumbar back condition or problem did not mean much for someone reading and evaluating the records (R. 278). Finally, Dr. Miller testified that Dr. Slack's report failed to indicate that Mr. Petrey suffered from severe muscle weakness or atrophy (R. 280).

In answering the ALJ's questions about whether a combination of persistent low back pain with post laminectomy syndromes, myofascial pain syndrome and psychiatric problems satisfy the conditions for being totally disabled, Dr. Miller responded that the combination did not meet a "Listing" in the Code of Federal Regulations based on objective evidence (R. 281), even though

8

Dr. Miller acknowledged that the conditions caused Mr. Petrey significant pain and psychological problems (R. 280).

Dr. Miller testified that Mr. Petrey was unable to perform his former job. However, Dr. Miller opined that Mr. Petrey retained the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently, to stand and/or walk for two hours in an eight-hour work day, to sit for six hours, and probably to perform up and down activity (but without dealing with ladders, scaffolds or stairs) (R. 281-82).

On the cross-examination, Dr. Miller testified that he was not a recognized psychiatrist and did not have expertise in psychiatric evaluation (R. 282). Mr. Miller testified that he did consider the psychological findings as to Mr. Petrey, which he said were "recognized" (*Id.*). However, Dr. Miller did not identify what psychological conditions he considered: for example, he did not discuss the finding by Dr. Cole of major depression that he categorized as "severe." Nor did Dr. Miller explain how Mr. Petrey's recognized psychological findings were incorporated – if at all – into his residual functional capacity assessment.

### 7. Edward Pagella.

The ALJ asked Edward Pagella, the Vocational Expert ("VE"), to consider two hypothetical individuals with the same age, education and work background as Mr. Petrey, but with differing capacities for work; he also asked the VE to provide an opinion as to whether there were jobs available to these individuals in the national economy (R. 287).

*First*, the ALJ asked the VE to assume an individual who: could lift and carry up to 20 pounds occasionally and 10 pounds frequently; could sit six of eight hours, stand six of eight hours and walk six of eight hours, subject to no restrictions on pushing, pulling or sit-stand options; was

subject to no environmental restrictions except for avoiding concentrated exposure to heights and moving machinery; and was subject to no mental restriction except for the restriction on ability to maintain attention and concentration for extended periods due to pain (R. 287). With those limitations, the VE testified that there would be a wide variety of light, unskilled occupations in the Chicago metropolitan area, such as 12,600 cashiering positions, 6,800 hand packer positions, and 9,300 assembler positions (R. 288).

*Second*, the ALJ asked the VE to assume an individual who was limited to a sedentary occupation[5] and subject to the other environmental or postural restrictions as the individual in the first hypothetical. The VE testified that there would be about 12,200 jobs available in the Chicago metropolitan region (R. 291).

On the cross-examination by Mr. Petrey's attorney, the VE also was asked to consider two hypothetical individuals. *First*, the attorney asked the VE to assume an individual who would miss more than four days each month with all other restrictions the same as those in the ALJ's first hypothetical; the VE testified that there were no available jobs in the national economy for a person with those limitations (R. 288). *Second*, the attorney asked the VE to assume an individual of a General Assessment of Functioning ("GAF") of 50; again, the VE testified that such a person would be unemployable, and not be able to perform any type of substantial gainful activity (R. 288).

## C. Administrative Opinion.

In reviewing Mr. Petrey's application for DIB, the ALJ followed the five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520. The ALJ determined that Mr. Petrey met Step

---

[5]"Sedentary" work is defined as work where an individual can lift up to 10 pounds on an occasional basis, or frequently lift and carry items such as letters (R. 291).

1 because he had not engaged in substantial gainful activity since June 18, 1998 (R. 20). At Step 2, the ALJ found that Mr. Petrey's chronic low back pain was a severe impairment (R. 20-21). However, at Step 3, the ALJ found that Mr. Petrey did not have an impairment or combination of impairments that meets any specifications of an impairment listed in the SSA regulations (R. 21). In making this decision at Step 3, the ALJ found that Mr. Petrey's impairments did not constitute more than "slight limitations in social functioning and in concentration, persistence or pace" (R. 21).

Having concluded that Mr. Petrey's impairments were not medically equivalent to any of the Listings, the ALJ moved to Steps 4 and 5. In making his determination at Step 4 concerning Mr. Petrey's ability to perform his prior work and his RFC, the ALJ relied upon Dr. Miller's testimony that the record does not indicate any evidence of herniation, nerve root, or any muscle weakness or atrophy (R. 23). The ALJ also turned to Dr. Miller's testimony and found that there were no side effects from medication for an extensive period of time (R. 23).

At Step 5, the ALJ, relying on the VE's testimony, decided that there would be thousands of jobs available in the Chicago metropolitan area that Mr. Petrey could perform given his RFC (R. 25-26).

In determining the RFC, the ALJ declined to take into consideration the GAF score of 50 and Dr. Slack's opinion that Mr. Petrey would have to miss work for more than four days a month (R. 26). The ALJ stated that the medical evidence of record provided no persuasive basis for these restrictions, and that a GAF assessment alone is insufficient evidence of a mental impairment (R. 26). The ALJ found that Mr. Petrey had the capacity to "lift/carry 10 pounds frequently and 20 pounds occasionally," to stand/work and sit about six hours out of an eight-hour day, but to do "no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling" (R. 23). The

ALJ found that Mr. Petrey should avoid "concentrated exposure to heights and moving machinery," but did not have any "manipulative, visual, or communicative limitations" (R. 23). The ALJ determined that since Mr. Petrey's ability to maintain concentration would only be moderately limited due to pain, as opposed to mental impairment, Mr. Petrey remained capable of performing unskilled work (R. 23). Based upon this assessment, the ALJ finally decided that Mr. Petrey could perform a limited range of light work, even though he was not capable of performing his past occupation (R. 23).

The ALJ refused to accord controlling weight to Dr. Slack's medical opinions with respect to Mr. Petrey's RFC for several reasons. *First*, the ALJ decided that Dr. Slack's statement of "disabled," and "unable to perform gainful activity" were not medical opinions, and thus not entitled to weight (R. 24). *Second*, the ALJ found that Dr. Slack's opinions were conclusory (R. 24). *Third*, the ALJ argued that Dr. Slack's opinions were without supporting documentation and appeared to "be based more on the claimant's subjective assertions rather than on the objective signs and findings" (R. 24). *Fourth*, the ALJ concluded that Dr. Slack's opinions were not consistent with Dr. Muellner's medical opinion, who found that Mr. Petrey's "reflexes and sensation are intact and there was no evidence of balance disorder" (R. 24).

The ALJ also found that Mr. Petrey's subjective complaints were not credible based upon two major grounds. *First*, the ALJ found that there were suggestions in the record of malingering (R. 25). *Second*, the records from Mr. Petrey's emergency room visit and treatment records from Dr. O'Donnell did not identify symptoms or complaints consistent with Mr. Petrey's alleged back pain.

12

## II.

We begin with a brief review of the legal standards. In order to establish a "disability" under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A) (2002). A claimant must demonstrate that his impairments prevent him from performing not only his past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(1)(A) (2002).

The social security regulations prescribe a sequential five-step test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (2002). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520; *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992).

A finding of disability requires an affirmative answer at either Step 3 or Step 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* In cases of severe impairment, the ALJ's analysis at Step 4 typically involves an evaluation of the claimant's RFC to perform the past relevant employment. *See* 20 C.F.R. § 404.1520(c). If a person can still do this kind of work, the Commissioner will find that the person

13

is not disabled. *Id.* The Step 5 analysis involves an evaluation of the claimant's RFC to perform any other work in the national economy (other than the relevant past occupation). *See Bowen v. Yuckert,* 482 U.S. 137, 142; 20 C.F.R. § 1520(f). If a person with such a RFC can still find jobs in the national economy, the Commissioner will find the person not disabled.

In reviewing the ALJ's decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). The Court must accept the findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g) (2002), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Dray v. R.R. Retirement Bd.,* 10 F.2d 473, 480 (7th Cir. 1993) (quoting *Richardson v. Perales,* 402 U.S. 389 (1971)). When conflicting evidence allows reasonable minds to differ, the responsibility for determining whether the claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan,* 912 F.2d 178, 181; *see also Stuckey v. Sullivan,* 881 F.2d 506 (7th Cir. 1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrart v. Sec'y of Health and Human Services,* 969 F.2d 534, 538 (7th Cir. 1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen,* 782 F.2d 79, 83 (7th Cir. 1986) (per curium).

However, the ALJ is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not elect and discuss only the evidence which favors his or her ultimate conclusion. *See Herron,* 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece

14

of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id.*; *see also Young*, 957 F.2d at 393 (the ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, at 9 (N.D. Ill. March 3, 1994) ( the ALJ need not spell out every step in reasoning, provided that the ALJ has given sufficient direction that the full course of the decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir. 1988)). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See e.g. Zurawski v. Halter*, 245 F.3d at 887, 889 (7th Cir. 2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). Specific reasons are required so that the reviewing Court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)).

## III.

On appeal, Mr. Petrey challenges the ALJ's findings at Step 5 of the sequential analysis on several grounds. *First*, Mr. Petrey contends that ALJ improperly rejected the treating physician's medical opinion and relied on the opinion of a doctor who never treated him (Pl.'s Mem. at 8). *Second*, Mr. Petrey contends that the ALJ erred in finding that he did not have a severe mental impairment, even though the mental health professional at RIC concluded that he had major depression (Pl.'s Mem. at 13). *Third*, Mr. Petrey argues that the ALJ erred in relying upon the VE's responses to hypothetical questions that did not include all of his limitations (Pl.'s Mem. at 13-14).

Finally, Mr. Petrey contends the ALJ erred in rejecting his credibility, even though he was prevented from testifying at the hearing (Pl.'s Mem. at 14-15).

**A.**

We begin our analysis with the ALJ's rejection of Dr. Slack's medical opinions. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). Treating physicians are likely to be the medical professionals most able to provide a detailed, longitudinal picture of a patient's medical impairments, and a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, or brief hospitalization. 20 C.F.R. § 404.1527 (d)(2).

There is no dispute by the parties that Dr. Slack was Mr. Petrey's treating physician during the period at issue. But the ALJ plainly gave little or no weight to Dr. Slack's medical opinions, let alone controlling weight. In doing so, the ALJ correctly noted that a claimant is not automatically entitled to disability benefits simply because a treating physician states that the claimant is "disabled" or "unable to work." *Clifford v. Apfel*, 27 F.3d 863, 870 (7th Cir. 2000). Under the Social Security regulations, the determination of the ultimate issue of disability is reserved to the Commissioner. 20 C.F.R. § 404.1527(e). Therefore, the ALJ was correct in finding that no controlling weight shall be given to Dr. Slack's medical opinions in several of the reports that Mr. Petrey was "temporarily disabled" and "permanently disabled from gainful employment." However, the ALJ's reasons for rejecting Dr. Slack's other medical opinions are conclusory and insufficient to justify the determination.

The ALJ found that Dr. Slack's diagnosis did not have findings of radiculopathy, parasthesias, atrophy or loss of strength to reveal the type of significant clinical or laboratory abnormalities one would expect if Petrey were in fact disabled. In making this finding, the ALJ relied upon the ME's testimony. However, the record indicates that the ME was addressing whether Mr. Petrey's impairments were severe enough to meet the Listings, which is a Step 3 rather than a Step 5 analysis (R. 280). A negative answer to Step 3 does not preclude a finding of disability at Step 5.

In addition, we do not believe the ALJ adequately supported his conclusion that Dr. Slack's opinions were inconsistent with other medical opinions. *First*, the ALJ found that Dr. Muellner's opinions contradicted to Dr. Slack's findings because Dr. Muellner found that Mr. Petrey's reflexes and sensation were intact (R.137). However, in reviewing the record, the Court does not find any material discrepancies between Dr. Slack and Dr. Muellner's opinions. In many of the medical reports, Dr. Slack opined that Petrey's reflexes and sensation were intact (R. 120, 121, 192). Moreover, Dr. Muellner found that Mr. Petrey had low back pain consistent with myofascial syndromes (R. 138). Thus, both Dr. Muellner and Dr. Slack found the existence of low back pain.

*Second*, the ALJ found that Dr. O'Donnell's report indicated that Mr. Petrey's physical examination was negative (R. 262-63). The emergency room visit report indicated that there was "no back pain or leg pain." The record indicates that the purpose of Mr. Petrey's emergency room visit was for headache. So, there is a reasonable doubt that a thorough examination on Mr. Petrey's low back and leg was conducted. The cases have consistently insisted that an ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (citing *Moore v. Barnhart*, 278 F.3d 920 (9th

17

Cir. 2002)). However, the ALJ failed to prove why the single emergency visit report and Dr. O'Donnell's opinion constituted substantial evidence.

*Third*, the ALJ criticized Dr. Slack's opinions as conclusory (R. 24). Our review of the record reveals that Dr. Slack's opinions concerning Mr. Petrey's limitations are no more conclusory than the physical and mental RFC reports by the state examiners, which the ALJ cited without criticism (R. 22). The state agency physical RFC report rejected Dr. Slack's opinions on residual functional capacity on the ground that Mr. Petrey's problem with ongoing pain response was not supported by the evidence in the file (R. 229), without explaining the basis for that conclusion – and without discussing the report of Dr. Cole, the RIC staff psychologist, who diagnosed Mr. Petrey with chronic pain syndrome that lead to moderate to severe problems in pain control (R. 143-44). The state agency mental RFC report said that the medical evidence was insufficient to permit an opinion on any psychological limits on RFC (R. 233), without explanation – and without discussing Dr. Cole's finding that Mr. Petrey suffered from major depressive disorder, which presented a severe problem (R. 143-44). Likewise, the ALJ accepted without criticism the RFC findings by the testifying ME, who testified that he "considered" the psychological findings of record concerning Mr. Petrey (R. 282) – without explaining what those findings were, whether they factored into his RFC opinion, and if so, how they affected that opinion. In light of the conclusory nature of other medical opinions the ALJ accepted his dismissal of Dr. Slack's opinion by labeling them as conclusory is not supported by substantial evidence.

*Fourth*, the ALJ suggested that Dr. Slack's opinions should be disregarded because he was unduly swayed by Mr. Petrey's subjective complaints (R. 24). That criticism presumes that a treating physician must disregard subjective complaints by a patient and must instead focus exclusively on

18

objective evidence. This is not the law. *See Scott v. Astrue*, No. 06-2541, 2007 WL 1725252 (E.D. Pa., June 12, 2007). Indeed, the treater will be in the best position to comment on the genuineness of subjective complaints. That might be the case here, where Dr. Slack treated Mr. Petrey over an extended period of time; made numerous efforts to get Mr. Petrey back to work; and could observe first-hand the difficulties presented. Moreover, in making a credibility determination about Mr. Petrey's complaints, the ALJ cited to "suggestions of malingering" (R. 25). The "suggestions" are found in the report of one doctor whom Mr. Petrey saw on one occasion (R. 149). The ALJ failed to provide an adequate explanation for accepting this one-time suggestion of malingering, yet failing to give weight to a long-time treater's opinion that Mr. Petrey's complaints of pain were genuine.

It is worth emphasizing that "a finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected," and it may "still be entitled to deference and be adopted by the adjudicator." SSR 96-2P, 1996 WL 374188 (S.S.A). Therefore, even though the ALJ could refuse to give controlling weight to Dr. Slack's opinions, it did not mean that Dr. Slack's opinions could be automatically disregarded. The Social Security regulations provide that when the treating source's opinion is not given controlling weight, the opinion shall still be evaluated in light of the length of the treatment relationship and the frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, etc. *See* 20 C.F.R. § 404.1527 (d)(2)(i)-(ii) & (d)(3)-(6). The failure of the ALJ to provide adequate justification for failing to give Dr. Slack's opinions controlling weight, or indeed any weight, requires a remand.

## B. Mental Impairment.

The ALJ similarly rejected Mr. Petrey's allegation of mental impairment in a conclusory manner, providing little explanation. The ALJ found that Mr. Petrey's medically determinable mental

19

impairment was not severe, even though there was reasonably an overlay between anxiety, depression and chronic pain syndrome (R. 23). In reaching this conclusion, the ALJ did not take into account the available medical evidence, such as Dr. Cole's opinion that Mr. Petrey's major depression presented a severe problem (R. 144) and the SOFA score of 50 (R. 143).

The ALJ found that the available medical evidence contained "assertions regarding anxiety, depression and panic attacks" (R. 23). In fact, the evidence shows more than mere "assertions" of depression: Dr. Cole, a psychologist, diagnosed Mr. Petrey as suffering from major depression that was severe (R. 143-44).[6] The ALJ did not address that specific diagnostic finding when he found "no medically determinable impairment that is severe" (R. 23). The ALJ was similarly dismissive in rejecting the finding by Dr. Cole that Mr. Petrey rated as 50 on the SOFA scale (R. 143).

In the written decision, the ALJ must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See e.g. Zurawski*, 245 F.3d at 889. Here, the ALJ failed to establish a logical explanation for rejecting the allegation of mental impairment. This failure provides an independent basis for remand.

### C. Hypothetical Questions.

Mr. Petrey argues that the ALJ based his conclusion on jobs available to Mr. Petrey by relying on the VE's response to hypothetical RFCs that omitted two significant limiting factors: a GAF of 50, and a need to miss more than four days of work each month. And, indeed, the ALJ did

---

[6]In his opinion, the ALJ cited Dr. Harden as examining Mr. Petrey on January 30, 2000, and making the diagnosis of major depressive disorder (R. 22). The report citing that finding was signed by Dr. Cole, and is based on a January 5, 2000 evaluation.

disregard those limitations with the conclusory statement that "the medical evidence provides no persuasive basis for these restrictions" (R. 26).

As for missing work, the record shows that when Mr. Petrey attempted to return to work, he would encounter difficulty after four days of work (R. 211). That translates into missing four or more days of work each month. While it is not "medical" evidence, the ALJ offered no explanation why actual attempted work experience should be entirely disregarded. This failing was significant, because the VE testified that there would not be a substantial number of jobs in the national economy for a person with that limitation (R. 288). For this reason, a remand is required.

As for the GAF score, as we have noted, Mr. Petrey's non-attorney representative asked a hypothetical that required the VE to assume a GAF score of 50 (R. 288).That question incorrectly conflated the score on the SOFA scale assigned by Dr. Cole in her assessment and the GAF scale used in the SSA disability process. As a result, when the ALJ said there was no medical evidence to support a GAF score of 50, he may have been literally correct – Dr. Cole did not provide a GAF score in her assessment. However, on remand, the ALJ should address what correlation, if any, there is between a GAF score and a SOFA score in order to determine what weight should be given to the SOFA score that Dr. Cole gave to Mr. Petrey.

### D. Mr. Petrey's Credibility.

An ALJ's credibility determination generally will not be overturned unless it was "patently wrong." *Powers v. Apfel*, 207 F.3d at 435. In the written decision, the ALJ must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See e.g. Zurawski*, 245 F.3d at 889 (7th Cir. 2001) (quoting *Clifford*, 227 F.3d at 872 (7th Cir. 2000)). This is especially true regarding credibility

determinations since both the case law and the regulations require an ALJ to minimally articulate the specific reasons for the credibility finding. *Zurawski*, 245 F.3d at 887.

The ALJ rejected Mr. Petrey's credibility based upon the ground that the record suggests "malingering and secondary gain (worker's compensation claim)" (R. 25). We note that none of the doctors who examined Mr. Petrey used the word "malingering" to describe him. Dr. Muellner found that Mr. Petrey was willing to be retrained and employed (R. 136). Dr. Slack also stated in his report that Mr. Petrey was not a malingerer (R. 108). No evidence in Dr. Cole's report indicates evidence of malingering (R.140-43). Neither Dr. Slack nor the RIC team who examined Mr. Petrey doubted that he suffered from chronic pain.

Indeed, the ALJ agreed that there was no doubt that Mr. Petrey suffered pain, but found no recorded evidence supported his allegations or testimony regarding the extent of pain and functional limitations (R. 25). With respect to testimony that might be found inconsistent with the medical evidence, the Seventh Circuit has instructed:

> [T]he ALJ must obtain detailed description of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including the claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994). It is not enough for the ALJ to make a conclusory statement that the claimant's allegations have been considered. The ALJ must also question the claimant regarding the basis for those allegations. Here, however, the ALJ did not question Mr. Petrey regarding his daily activities, but simply invited Mr. Petrey to adopt his representative's

22

summary of the facts as his sworn testimony. On remand, the ALJ should take care to develop Mr. Petrey's testimony concerning pain in order to ensure a record that will fully permit him to assess credibility.

## CONCLUSION

For the foregoing reasons, we deny the Commissioner's motion for summary judgment (doc. # 24), and grant Mr. Petrey's motion for summary judgment (doc. # 23). The case is remanded for further proceedings consistent with this opinion, pursuant to Sentence 4 of 42 U.S.C. § 405(g).

**ENTER:**

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**Dated: June 21, 2007**